John Michael **SOBUS**

v.

**LUMBERMENS MUTUAL CASUALTY COMPANY, an Illinois Corporation.**

Civ. No. 72–195–K.

United States District Court,
D. Maryland.

March 26, 1975.

662

Emanuel H. Horn, Baltimore, Md., for defendant.

FRANK A. KAUFMAN, District Judge.

On October 28, 1965, Charles Loren Knisley brought suit in the Circuit Court for Howard County against the plaintiff herein, John Michael Sobus, seeking damages for injuries allegedly incurred in an automobile collision on May 22, 1965. On that date Sobus, 19 years of age at the time of the accident (Defendant's Exhibit C, after lunch proceeding, at p. 4), was insured in the amount of $25,000 by the defendant, Lumbermens Mutual Casualty Company (hereinafter Lumbermens) under a family automobile liability policy taken out by Sobus' father. The terms of the policy called upon Lumbermens, *inter alia*, to defend Sobus against Knisley's suit. Lumbermens employed the firm of Due, Whiteford, Taylor and Preston, Baltimore, Maryland, to represent Sobus. After investigating the claim, Lumbermens did not agree to any settlement demands by Knisley's attorneys, nor did Lumbermens make any offer to settle the case, until February 24, 1969, the day the trial began, when in response to Knisley's demand for "all available insurance", Lumbermens offered the full policy limit of $25,000. Knisley's attorneys, apparently in hope that Sobus was insured under one or more other policies, sought additional information with regard thereto and were given the opportunity to question Sobus in the chambers of Judge James A. Macgill on the record. By that time the jury had already been selected and thus the trial had begun. In Judge Macgill's chambers, Sobus revealed that there were more automobiles in the household than originally indicated by Sobus prior to trial, including during conversations with his own attorneys. Specifically, in Judge Macgill's chambers, Sobus referred to an automobile owned by Sobus' brother which was insured by the Penn National Insurance Company. That night—the night of February 24,

M. Stanley Radcliffe, Towson, Md., for plaintiff.

1969—and the next morning both Sobus' attorneys and Knisley's attorneys made efforts to ascertain whether there was any other insurance available to Sobus. On February 25, 1969, Knisley's attorneys, apparently unsatisfied with the completeness of the records shown to them, refused to accept the $25,000 unless allowed to reserve certain rights, the exact nature of which are in dispute as is discussed in detail *infra*. Sobus' attorneys, after stating that they knew of no insurance coverage other than Lumbermens' $25,000 and after representing that $25,000 was all of the insurance that the Kemper Group, of which Lumbermens was a member, had available to Sobus, refused to allow Knisley to reserve the rights which Knisley's counsel desired to reserve. The case proceeded to trial, and on March 6, 1969, the jury rendered a verdict for $175,000 in Knisley's favor. After judgment for that amount was affirmed on appeal, Sobus, faced with the judgment entered against him in excess of his $25,000 Lumbermens coverage and apparently having no other insurance coverage, instituted the within suit against Lumbermens, alleging that the company acted negligently and in bad faith while representing him.

Sobus' charges against Lumbermens seemingly fall into four broad categories of complaint:

1. Counsel selected for Sobus by Lumbermens committed trial errors, including the failure to object to an increase in the *ad damnum* clause of Knisley's complaint.

2. Lumbermens, before trial, made an inadequate investigation and appraisal of the case against Sobus.

3. Lumbermens acted in bad faith in refusing to settle the case.

4. Lumbermens failed to evaluate properly the case after the verdict had been rendered against Sobus, and negligently thereafter failed to negotiate settlement.

 Lumbermens has moved for summary judgment. "[W]hether summary judgment is appropriate in any case is * * * to be decided upon the particular facts of * * * [a] case * * *." First National Bank of Arizona v. Cities Service Co., 391 U.S. 253, 259, 88 S.Ct. 1575, 1577, 20 L.Ed.2d 569 (1968). Summary judgment may be granted only if, as provided by Federal Civil Rule 56(c), "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In this case, although there exist certain factual disputes, the uncontroverted facts entitle the defendant to summary judgment.

## FACTS

1. The collision between Knisley and Sobus occurred at approximately 8 P.M. on Saturday, May 22, 1965, at the intersection of State Route 32, a favored highway, and Marriottsville Road, an unfavored highway. Neither driver was able to recall the occurrence of the accident. The issue of liability depended on establishing which vehicle was proceeding on the favored highway (Complaint ¶ 9; answer ¶ 10).

2. Sobus informed Lumbermens at all times that he had been proceeding on Route 32, the favored highway (Defendant's Exhibits 1 at p. 2; 1A at p. 2; 2 at p. 8; 3 at pp. 232–33; 4 at pp. 10–11; 6 at p. 12).

3. On May 22, 1965, Sobus was insured under a Lumbermens policy against automobile negligence liability in the amount of $25,000 (Complaint ¶ 2). The policy under which Sobus was insured was a family policy taken out by Sobus' father. (Defendant's Exhibits 4 at p. 39; 5 at p. 3).

4. The insurance policy provided, among other things, that Lumbermens would investigate any claim against Sobus and that Lumbermens would defend Sobus against any such claim. (Complaint ¶¶ 5, 7; Answer ¶¶ 5, 7).

5. Approximately ten minutes after the accident, Trooper Barnes of the

Maryland State Police arrived on the scene of the accident and made an investigation. Barnes also obtained a signed statement from an eyewitness, Lawrence B. Duncan, who stated that Knisley's vehicle was traveling along Route 32 when Sobus' vehicle pulled out of Marriottsville Road. Trooper Barnes filed a report concluding that Knisley had been on the through highway. Barnes charged Sobus with failure to yield the right of way. (Complaint ¶ 10; Answer ¶ 10).

6. Shortly before the accident, two police officers, W. R. McElroy and Millard F. Cooper, observed Knisley proceeding along Route 32 at a time which would have placed Knisley on Route 32 around the time of the accident. (Complaint ¶¶ 11, 15; Answer ¶¶ 11, 15).

7. Lumbermens deposed Trooper Barnes on May 24, 1966 (Complaint ¶ 12). Lumbermens deposed Lawrence B. Duncan on February 19, 1969 (Complaint ¶ 13). Lumbermens obtained the transcript of certain testimony which Officer McElroy gave at a traffic court hearing in the Westminster Magistrate Court on August 28, 1965, which contained a recitation of what he had seen before the accident (Complaint ¶ 11). Agents for Lumbermens contacted and interviewed Trooper Barnes, Lawrence B. Duncan, and Officer Cooper before filing a report with their company on June 16, 1965. That report contained photographs of the accident site as well as an analysis of the accident itself. The analysis supported Sobus' position that he was on Route 32. (Plaintiff's Exhibit 3).

8. On May 28, 1965, Sobus stated to a Lumbermens claims representative, apparently either C. E. Hollie or L. J. Wolf (see Plaintiff's Exhibit 3; Deposition of John Michael Sobus, September 16, 1972, at p. 10), that his father owned two vehicles, both automobiles (Defendant's Exhibit 1), one of which Sobus normally operated.

9. On August 12, 1965, L. M. Davis, a Lumbermens' claims agent, reported that Knisley appeared to have suffered substantial injury and that a "king size claim" was possible (Plaintiff's Exhibit 4).

10. On October 4, 1965, Patrick A. O'Doherty, Esq., one of Knisley's attorneys, wrote to Lumbermens informing the company that he would shortly bring suit on Knisley's behalf and stating: "[w]e understand, from our own investigation, that your insured carries no more than $20,000 or $25,000 insurance for the injury to any one person"; and "[i]f he [Sobus] denies he was on Marriottsville Road the company [Lumbermens] may have a bona fide reason for defending the action without risking the payment of an excess verdict." (Defendant's Exhibit R–2).

11. On October 26, 1965, L. J. Wolf, one of Lumbermens' agents, wrote to another Lumbermens' agent, M. L. East (Plaintiff's Exhibit 6), concerning an expert report of Professor Francis J. Smith of the Drexel Institute of Technology in Philadelphia which placed Sobus on Route 32 at the time of the accident (Plaintiff's Exhibits 4, 6). That letter also reveals that Wolf told O'Doherty, who had called Wolf concerning settlement, that Lumbermens' investigation "revealed no liability" on Sobus' part.

12. On October 28, 1965, Knisley instituted suit against Sobus in the Circuit Court for Howard County, claiming damages in the amount of $150,000.

13. On November 30, 1965, Lumbermens wrote to Sobus informing Sobus that Lumbermens had employed the Baltimore firm of Due, Whiteford, Taylor and Preston to defend Sobus. The letter also stated that the amount demanded by Knisley, $150,000, exceeded Sobus' policy limits and that Sobus, for that reason, might deem it advisable to hire his own attorney. (Defendant's Exhibit A). Sobus understood the content of that letter. (Defendant's Exhibit 4 at p. 8).

14. On February 21, 1966, Knisley's attorney deposed Sobus. (Defendant's Exhibit 2). On that same date, "a couple hours" before the taking of that deposition, Sobus met with Paul F. Due, Esq., the senior partner in the law firm selected by Lumbermens to act as his counsel. (Post-trial Deposition of John Michael Sobus, September 16, 1972, at pp. 11–13). In his post-trial deposition of September 16, 1972, Sobus at first stated (at 13) that on February 21, 1966, in response to Due's questioning, he had told Due that he had no insurance covering the accident other than the Lumbermens policy. Although later in that same 1972 post-trial deposition Sobus asserted (at 47) that he did not remember whether Due or Preston had ever asked Sobus whether Sobus had any insurance other than with Lumbermens, Sobus acknowledged (at 47) that "[t]hey could have", and that his answer to such a question would have been "No". Because of the summary judgment posture of this case, this Court proceeds herein upon the basis that Sobus was not questioned by Due as to other possible insurance coverage.

15. On February 24, 1966, a Lumbermens field claim agent wrote to a Baltimore claims agent of Lumbermens, suggesting an increase in the insurance reserve due to Knisley's serious injuries. (Plaintiff's Exhibit 5).

16. On March 15, 1966, the State Accident Fund intervened as a use plaintiff in the Howard County proceedings.

17. On June 8, 1966, a memorandum relating to the accident was placed in the files of Due, Whiteford, Taylor and Preston by William M. Nickerson, Esq., of the same firm (Plaintiff's Exhibits 13, 15), revealing Nickerson's belief, after deposing Trooper Barnes, that Barnes' analysis of the accident was impeachable.

18. On July 20, 1966 and September 25, 1967, Paul F. Due, Esq. wrote to Lumbermens indicating that Due was not confident of the reliability of Sobus' story that he was on Route 32. (Plaintiff's Exhibits 13, 16).

19. On April 20, 1968, Wilbur D. Preston, Jr., Esq., a partner of Mr. Due, wrote to Lumbermens outlining the strengths and weaknesses of Sobus' case, stating that the liability issue would present a close question to the jury, and that a verdict adverse to Sobus "could be in the neighborhood of $75,000." (Plaintiff's Exhibit 14).

20. On September 25, 1968, O'Doherty made an oral settlement offer to Lumbermens. (Lumbermens' Answers to Interrogatories # # 6–7).

21. On January 20, 1969, Frank X. Gallagher, Esq., one of Knisley's attorneys, wrote to Preston, stating Gallagher's views as to the weakness of Sobus' case and offering to settle the case for "all applicable insurance coverage." A copy of that letter was sent by Gallagher to John Sloan, Esq., who is referred to *infra*. (Defendant's Supp. Exhibit A).

22. In a letter dated February 6, 1969, Preston forwarded Gallagher's letter of January 20, 1969 to Lumbermens Claim Supervisor, H. W. Corey, and indicated some pessimism as to Sobus' case. Preston had by then received the statement of Lawrence Duncan and had talked with Trooper Barnes who had indicated that Sobus had changed his story after talking to a claims adjuster. (Defendant's Supp. Exhibit B). Also on February 6, 1969, Preston addressed a letter to Sobus advising him of the forthcoming trial date, and requesting Sobus to telephone Preston to make arrangements so that Preston and Sobus could meet prior to trial. Preston has stated in an affidavit that he did not at that time enclose for Sobus with his (Preston's) said February 6, 1969 letter a copy of Gallagher's January 20th letter in view of the fact that Gallagher had previously forwarded a copy of the same to Sloan. (Supplemental Affidavit of Wilbur D. Preston, Jr., Esq., September 13, 1973, at p. 2).

23. On February 19, 1969, Preston sent Sobus a letter and attached to it a copy of Gallagher's letter of January 20, 1969. Preston informed Sobus that Sobus' policy limit was only $25,000

while the claim against him was $150,000. Preston advised Sobus that he might want John Sloan, an attorney who had represented Sobus at the traffic court hearing in the Westminster Magistrate Court held on August 28, 1965 in connection with the collision (*see* Sloan's letter of August 11, 1970, appended to Defendant's Answers to Interrogatories; Complaint ¶ 11), or another attorney to represent him in the case. Preston also informed Sobus that Knisley would accept the policy limits in settlement but that Lumbermens would not offer it, at least not until Knisley made out a prima facie case, because of the serious doubt as to whether liability existed. Sobus stated that he understood the contents of that letter. (Defendant's Exhibit 4 at pp. 18–20, 24). Preston sent a copy of that letter to Sloan, specifically stating to Sobus that he believed Sloan to be Sobus' personal attorney. In that regard, in a post-trial deposition given February 1, 1973, Sloan indicated (at p. 8) that from the time of Sobus' traffic court hearing until February 19, 1969, neither Sobus nor his father had consulted with Sloan, that (at p. 11) he was not Sobus' personal counsel, and that (at p. 43) there was no reason he should have been kept advised of the status of Knisley v. Sobus. However, Sloan also indicated (at p. 36) that he was "sure" that "from time to time" he had talked to Sobus and tried "to guide him" without ever "being formally retained". And Sloan also stated (at p. 11) that "[i]f he [Sobus] had a personal counsel, I would be it."

Moreover, there is seemingly no indication in the record that Sloan or Sobus or anyone else ever indicated to Preston that Sloan was not Sobus' personal counsel until August 11, 1970.

24. On February 21, 1969, Gallagher wrote a letter to Preston, stating Gallagher's belief in the strength of Knisley's case and offering to settle the case "for all applicable insurance coverage." (Plaintiff's Exhibit A).

25. On February 23, 1969, Preston and Sobus met and journeyed to the scene of the accident where Preston discussed with Sobus the forthcoming trial, including the possibility that the jury might render in Knisley's favor a verdict in excess of the policy limits. (Defendant's Exhibit 4 at pp. 18–20, 25). Although the complaint at paragraph 21 states Sobus' belief that he was not fully informed by his counsel as to the contents of Gallagher's letter of February 21, 1969, Sobus, in his deposition of September 16, 1972, stated that he could not remember whether Preston had showed it to him or not. (Defendant's Exhibit 4 at p. 25). Preston, on the other hand, has stated in an affidavit that on February 23, 1969, he showed the letter to Sobus. (Affidavit of Wilbur D. Preston, Jr., Esq., September 13, 1973, at 3–4). In the summary judgment context of this case, this Court proceeds in this opinion upon the basis that Sobus was not shown or fully informed as to the contents of Gallagher's said letter and thus in this opinion accepts the facts as stated by Sobus.

26. On February 24, 1969, the trial of Knisley v. Sobus began in the Circuit Court for Howard County, Chief Judge James Macgill presiding. In the morning Judge Macgill seated the jury members and then dismissed them for the luncheon recess. Out of the presence of the jury, O'Doherty moved to amend the *ad damnum* clause from $150,000 to $250,000. Preston objected, but stated, in answer to the Court's question, that if O'Doherty was permitted so to amend at that late hour, such amendment would not seriously interfere with Preston's defense of the case. However, even so, Preston unsuccessfully sought a continuance which was denied. (Defendant's Exhibit C, morning proceeding, at p. 4). On that basis, after a moment or two's colloquy with counsel, Judge Macgill granted the motion to amend the *ad damnum* clause (Defendant's Exhibit C, morning proceeding, at pp. 1–3). Further, Preston stated that there was a dispute between Knisley's attorneys and the attorneys for the use plaintiff, the State Accident Fund, as to who was en-

titled to control the litigation against Sobus. Preston stated that the resulting confusion plus the increase in the *ad damnum* clause, required him to ask for a continuance of the case. However, Judge Macgill refused to grant the same.

During the luncheon recess Gallagher telephoned to Preston and offered on behalf of both plaintiffs, *i. e.*, Knisley and the State Accident Fund, to settle the case for "all available insurance." (Defendant's Exhibit C, after lunch proceeding, at p. 1). Preston offered the full amount of the Lumbermens policy, *i. e.*, $25,000. Counsel for Knisley then requested the opportunity to question Sobus about other possible insurance coverage and Preston allowed Sobus to be examined on the record. That examination took place in Judge Macgill's chambers. During the questioning it was discovered that the Sobus family members living in the Sobus residence owned and operated three automobiles and one pickup truck, that is, four vehicles in all (*id.* at pp. 3–5), and that the automobile which Sobus' brother owned was insured under a separate policy taken out through Melville Scott, an agent (*id.* at p. 5). Sobus stated that the policies insuring all vehicles were available at his home, and that he could obtain that evening "at least the up-to-date copies" of the contracts of insurance on the vehicles owned by his father and his brother (*id.* at p. 7). Judge Macgill suggested that perhaps the simplest way to ascertain whether there was additional coverage would be for Sobus to make inquiry of Melville Scott, the family insurance agent, who presumably would have the files at hand and who Sobus indicated had all of his family's policies (*id.* at pp. 3, 5). Preston then stated that he, Sobus and a Lumbermens agent would proceed to Scott's office (*id.*).

Before the after lunch proceedings on the record outside of the presence of the jury concluded, there was considerable colloquy among Court and counsel in which Judge Macgill gave all counsel and each of them every opportunity to have the trial postponed and removed to another Court, an invitation which none of counsel accepted. Indeed, Judge Macgill criticized *counsel on both sides* for delaying the case after the trial had been scheduled and the jury summoned and selected, and for not having fully explored settlement in the years since the accident. (Defendant's Exhibit D, at pp. 12–15). There was also considerable discussion among counsel as to the settlement offer O'Doherty was in fact making. That discussion is reviewed *infra* in some detail.

27. There is some confusion as to what occurred on the night of February 24th. It is undisputed that Preston sent Sobus home to pick up Sobus' father's insurance policy. (Defendant's Exhibit 4 at pp. 29–35; enclosure to Plaintiff's Exhibit 11 at pp. 1–2). There is, however, some dispute as to whether Preston told Sobus to bring his brother's insurance policy. In his deposition, Sobus has first answered that Preston sent him home for only his father's policy, but under close questioning retracted and stated that he could not remember. (Defendant's Exhibit 4 at p. 35). On the other hand, Preston, in his affidavit, has stated:

> Because the best evidence of an insurance policy is the policy itself, Mr. Sybert, Mr. Corey and I asked John Michael Sobus if he still had these policies at home. He thought that they were available at home, and I told him to bring those policies to Court the next morning, so that the actual policies (both the Pennsylvania National and Lumbermens) could be shown to the Plaintiff's lawyers. John Michael Sobus said that he would do this. \* \* \* [Defendant's Supplemental Reply and Affidavit, November 23, 1973, at 4–5).

In the present summary judgment context of this case, only the facts undisputed by Sobus will be taken as undisputed. There is no dispute that on the evening of February 24th counsel

for Knisley met with Preston, Mr. Claude Koppisch of Penn National (that insurance company having issued the policy to Sobus' brother), and possibly also with a Lumbermens representative. Counsel for Knisley were given two form contracts, one a Lumbermens policy and one a Penn National policy. Preston and Koppisch represented that each policy was substantially the same as the contract then covering the Sobus family. The Lumbermens policy was dated prior to the accident. The Penn National policy was dated subsequent to the accident. Both were standard form policies. Neither Preston nor Koppisch would state unequivocally that the policies were exactly the same as those issued to Sobus' father and his brother. (Plaintiff's Exhibit 11 and enclosure thereto; Affidavit of Frank X. Gallagher, Esq., at p. 2 and enclosure thereto; Defendant's Exhibit 5-A at pp. 2-6, 8; Defendant's Supplemental Reply and Affidavit at pp. 5-8).

28. On February 25, 1969, Sobus informed Preston that he had been unsuccessful in his search for the policies. Preston then called Melville Scott and Son and arranged for the file pertaining to the Lumbermens policy to be delivered to Preston, and in turn Preston delivered them to Knisley's counsel at the Howard County courthouse. (Defendant's Supplemental Reply and Affidavit at p. 8). There is a factual dispute over exactly what Scott made available, and how long and under what circumstances Knisley's counsel were able to examine the material offered. The transcript of the proceedings on February 25th shows that Preston claimed that all of the endorsements were available to Gallagher, while Gallagher claimed that the declaration covering the truck was not available. (Defendant's Exhibit D, at pp. 3-5). That dispute notwithstanding, Preston asserted on the record that he turned over everything he received from Melville Scott and Son, and Sobus has neither alleged nor proffered any evidence to indicate that Preston held any-

thing back. (Defendant's Exhibit 5-A; Plaintiff's Exhibit 20 at pp. 2-3; Enclosure to Affidavit of Frank X. Gallagher at p. 3).

29. On February 25, 1969, O'Doherty and Preston held a long colloquy on the record explaining to Judge Macgill why they had failed to reach a settlement. During the dialogue, Preston affirmatively represented that $25,000 was offered and that $25,000 was all the insurance available under the Lumbermens policy. (Defendant's Exhibit 5-A at p. 3). Preston refused, however, to accept a settlement offer allowing Knisley to reserve the right to sue for any insurance coverage later discovered to have been applicable to Sobus. Further, he refused to warrant that the policies available to O'Doherty were "word for word" the same policies in effect at the time of the accident. (Defendant's Exhibit 5-A at pp. 8-9). John J. Hirsch, Esq., attorney for the State Accident Fund, however, expressed his willingness to accept Preston's settlement offer and stated his belief that Preston was offering all available insurance. Further, he informed O'Doherty that the State Accident Fund would hold Gallagher, O'Doherty and Knisley responsible if Knisley's refusal to settle worked to the detriment of the State Accident Fund. (Defendant's Exhibit 5-A at pp. 9-11).

30. On February 28, 1969, during a trial recess, Preston wrote Gallagher offering once more to settle the case for the amount of the Lumbermens policy and offering Gallagher the opportunity to inspect all of the records of Melville Scott and Son. Also, on that same date, Preston sent a copy of that letter to Sobus and to his father, and in the covering letter advised Sobus of his right to have Sobus' own attorney in the case. (Plaintiff's Exhibit 11 and enclosure thereto).

31. On March 3, 1969, Gallagher sent Preston a letter containing his version of the disputed facts surrounding the first two days of the trial. In that letter, he stated: "We questioned you

about other insurance and you said Michael Sobus advised you that there was only one automobile in the household and that his Kemper policy was the only one available. * * * Everyone, including you, was surprised to learn of the number of other vehicles involved." (Enclosure to Affidavit of Frank X. Gallagher at p. 2).

32. On March 4, 1969, Hirsch wrote to Preston and Gallagher, stating, among other things, that on February 24, 1969 Judge Macgill had ruled that the Fund had a right to participate fully in the case. Further, Hirsch stated that he had not had authority to settle the case until February 24th. Hirsch also stated that Preston had certified that $25,000 represented all of Kemper's applicable insurance, but that Preston would make no certification as to Penn National's coverage since Preston was not authorized to speak for that company. Finally, Hirsch informed his correspondents that he was still willing to settle the case on the basis of Preston's offer. (Defendant's Exhibit B).

33. On March 6, 1969, the jury rendered a verdict for Knisley in the amount of $175,000. (Complaint ¶ 30).

34. On March 7, 1969, Preston wrote Sobus a letter explaining the verdict and sent a copy of that letter to Sloan. (Letter appended to Defendant's Answers to Interrogatories).

35. On July 1, 1969, Preston wrote Sobus that he had unsuccessfully argued a motion for a new trial before Judge Macgill and suggested to Sobus that the latter obtain his own counsel to represent his "own individual interests." (Letter appended to Defendant's Answers to Interrogatories).

36. On August 13, 1969, Preston wrote to Sobus stating to Sobus that Preston was appealing the adverse judgment to the Court of Appeals of Maryland and advising Sobus to obtain his own counsel. (Letter appended to Defendant's Answers to Interrogatories).

37. On August 11, 1970, Sloan wrote to Preston to inform him that Sloan had not been retained by Sobus in connection with any civil action. (Letter appended to Defendant's Answers to Interrogatories).

38. On February 18, 1971, Preston wrote to Sobus to inform Sobus that the Court of Special Appeals of Maryland had affirmed the judgment against Sobus in the amount of $175,000, and advised Sobus to retain counsel. (Letter appended to Defendant's Answers to Interrogatories). A petition for a writ of certiorari was denied by the Court of Appeals of Maryland on April 13, 1971. (Complaint ¶ 30).

39. On May 25, 1971, Preston wrote Sobus to inform Sobus that Preston's firm had moved to strike its appearance in the case as Sobus' counsel and once again advised Sobus to consult with a lawyer. (Letter appended to Defendant's Answers to Interrogatories).

40. No insurance other than the Lumbermens policy has at any time been discovered to be applicable to the accident. (Transcript of September 10, 1973 at pp. 46–49).

## LAW

### I. THE NATURE OF LUMBERMENS' DUTY TO SOBUS

The four categories of allegations against Lumbermens deal with four different aspects of the litigation of Knisley v. Sobus. *See* p. 3, *supra*.

### A. TRIAL TACTICS

In his original complaint in this case, Sobus contended that Preston had failed to object to Knisley's motion to increase the *ad damnum* clause. At a hearing held in the instant case, however, Sobus' attorney in this case conceded that Preston had objected to the motion to increase the *ad damnum* clause (Transcript of September 10, 1973 at p. 18), and that Preston had requested Judge Macgill to grant a continuance of the trial. (*See* Transcript of September 10, 1973 at pp. 16–21; Finding of Fact 26; Defendant's Exhibit C at pp. 1–3). Accordingly, Sobus' attack on Pres-

ton's conduct in relation thereto is without merit. Any claim by Preston that his defense would be prejudiced by the increase in the damages claimed would have been rather frivolous. Thus, Sobus' contention in this case that Preston should have consulted Sobus before Judge Macgill ruled on the *ad damnum* increase is without merit.

As to trial tactics generally, it has also become unnecessary for this Court to determine the scope of Lumbermens' liability for any alleged trial errors by Sobus' trial counsel, since at the aforementioned hearing held in this Court, Sobus' counsel in this case dropped each of Sobus' contentions concerning those trial occurrences. (Transcript of September 10, 1973 at p. 21).

### B. PREPARATION FOR TRIAL

 Sobus apparently contends that Lumbermens failed adequately to investigate the case against Sobus and that Lumbermens' said breach of duty led to the adverse verdict. Although this Court has been cited to no Maryland law on that issue, it appears that an insurance company has a duty to conduct the actual defense of the insured with reasonable care and that the insurance carrier is liable for a verdict adverse to its insured in excess of the policy limits, which is caused by the insurer's negligence. Thus, inadequacy of investigation, if it leads to excess liability, is a breach of the insurer's duty.[1] With regard to Lumbermens' investigation, Sobus appears specifically to complain that—

(1) Lumbermens did not obtain the testimony of Lawrence B. Duncan until February 19, 1969, only six days before trial. (Complaint ¶ 13).

(2) Lumbermens failed to take the deposition testimony of Officers Cooper and McElroy before trial. (Complaint ¶ 15).

(3) Lumbermens, including its agents and its counsel employed by it to represent Sobus, failed fully and promptly to investigate the facts of the case. (Complaint ¶ 25).

(4) Lumbermens failed fully to evaluate Knisley's injuries. (Complaint ¶ 26).

(5) Lumbermens, and its agents, including counsel employed for Sobus, failed timely to discover the facts surrounding the accident and to evaluate properly the legal effect of the anticipated trial testimony. (Complaint ¶ 27).

In his answer to Lumbermens' within motion for summary judgment, Sobus complains that the company failed to evaluate properly inconsistencies in Sobus' various statements about the accident. (Answer to Defendant's Motion for Summary Judgment ¶ 4). Further, Sobus complains that Lumbermens failed to reduce to writing the statements Duncan made in 1965 so as to form an adequate legal opinion as to the impact of those statements on the question of Sobus' liability (Answer to Defendant's Motion for Summary Judgment ¶ 5).

In Radio Taxi Service, Inc. v. Lincoln Mutual Insurance Co., 31 N.J. 299, 157 A.2d 319 (1960), the Supreme Court of New Jersey was faced with an allegation by a plaintiff-insured that his insurance company's negligent investigation of the accident led to an adverse excess verdict against him. The Court stated that the plaintiff, in order to succeed, was required to show that the alleged negligence was a proximate cause of the adverse jury verdict. A finding that the negligence of an insurance company or its appointed counsel was responsible for the lost case "without any proof that such failure was related in cause to the loss would rest in sheer speculation or conjecture and could not be tolerated in

---

1. The law seems rather clear in that regard. *See* Keeton, Liability Insurance and Responsibility for Settlement, 67 Harv.L.Rev. 1136, 1137–41 (1954). *See also* Radio Taxi Service, Inc. v. Lincoln Mutual Insurance Co., 31 N.J. 299, 301, 157 A.2d 319, 321 (1960), cited with approval by the Court of Appeals of Maryland in State Farm Mutual Automobile Ins. Co. v. White, 248 Md. 324, 330, 236 A.2d 269 (1967).

the law." *Radio Taxi Service, Inc.*, 31 N.J. *supra* at 302–03, 157 A.2d at 321.

In the instant case, although Lumbermens did not depose Lawrence B. Duncan until six days before trial, plaintiff has failed to show how that fact in any way prejudiced his defense at trial. *See* Fact 1. Further, although Lumbermens waited for over three years after the accident to obtain Duncan's deposition, its agents interviewed Duncan shortly after the accident and familiarized themselves with his story. *See* Facts 5 and 7. It is true that Lumbermens failed to depose Officers Cooper and McElroy before trial. But Lumbermens had obtained before trial the statements containing the gist of the observations of those officers. *See* Facts 6 and 7. Further, Sobus has failed to show how the failure to take the depositions of those two officers adversely affected the trial of his case. Sobus' allegation that a full and prompt investigation was not undertaken is unsupported by any specific complaint. Sobus' allegation that Lumbermens failed to make an adequate appraisal of the extent of Knisley's injuries appears unsupported by the record, which discloses that Lumbermens realized that a verdict in Knisley's favor might well yield a verdict far in excess of the limits of the policy (*See* Facts 9, 19, and Plaintiff's Exhibit 4). Further, even if that allegation were supported by anything in the record, Sobus has not shown how such alleged negligence on Lumbermens' part contributed to the adverse verdict against him. Sobus' allegation that Lumbermens failed timely to discover facts surrounding the accident is general and unspecific. Sobus alleges that Lumbermens failed to appraise properly inconsistencies in Sobus' various statements about the accident. However, Sobus has not shown how that alleged lack of perception on Lumbermens' part led in any way to the loss of his case or to the award by the jury of any added damages. Sobus' trial defense centered upon the theory that Sobus was proceeding along Route 32 at the time of the accident, a fact which Sobus consistently maintained in statements to Lumbermens before trial and in testimony at trial. *See* Fact 2.

Sobus' statement that Lumbermens failed to reduce Duncan's statements to writing and to draw legal conclusions therefrom is contradicted by the record. *See* Fact 7 and Plaintiff's Exhibit 3 at p. 5. In sum, Sobus has failed sufficiently to allege or proffer any specifics or details as to negligence on Lumbermens' part which could rationally be deemed to have been a proximate cause of the adverse verdict against him, or to have caused the jury to award any additional damages.

## C. SETTLEMENT

In this diversity case, pursuant to *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), Maryland law governs—and the parties have so specifically agreed. (Transcript of September 10, 1973 at p. 6). *See American Casualty Co. v. Howard*, 187 F.2d 322, 325 (4th Cir. 1951). The controlling Maryland case is that of *State Farm Mutual Automobile Insurance Co. v. White*, 248 Md. 324, 236 A.2d 269 (1967), in which the Maryland Court of Appeals, after noting and discussing the conflict among the jurisdictions,[2] adopted the good faith standard. Although countless commentary has been written in an attempt to define the "good faith" standard, it remains a highly elusive one. As used by the Court of Appeals of Maryland, those words do not simply refer to a state of mind evidencing fraud. Rather, the insurer is generally required to weigh the interests of the insured at least equally with its own. *See Cernocky v. Indemnity Insurance Co.*

2. In selecting the "good faith" standard, the Court of Appeals of Maryland aligned itself with those courts which have adopted that standard rather than the negligence standard. *See* 7A Appleman, Insurance Law and Practice §§ 4711–13 (1962 ed. & 1972 Cum. Supp.); Keeton, Liability Insurance and Responsibility for Settlement, 67 Harv.L.Rev. 1136 (1954), *supra* n. 1.

of North America, 69 Ill.App.2d 196, 206–08, 216 N.E.2d 198, 204–05 (1966); Radio Taxi Service, Inc., 31 N.J. *supra* at 304, 157 A.2d at 322. Further, the concept includes elements of reasonable care and requires an insurer diligently to investigate and appraise a case, and to keep its insured reasonably well informed of the progress of the case, including settlement offers. *See* Gaskill v. Preferred Risk Mutual Insurance Co., 251 F.Supp. 66, 68, 72 (D.Md.1966) (Thomsen, C. J.), aff'd per curiam, 371 F.2d 792 (4th Cir. 1967); Ivy v. Pacific Automobile Insurance Co., 156 Cal.App.2d 652, 660, 320 P.2d 140, 146 (1958); Hilker v. Western Automobile Insurance Fund, 204 Wis. 1, 235 N.W. 413, 414, 415 (1931). Although the standard requires honesty and diligence, it does not impose liability upon the insurer for simple negligence alone. Negligence, however, if "serious and recurrent * * * may be indicative of bad faith." *See* Brown v. United States Fidelity and Guaranty Co., 314 F.2d 675, 680 (2d Cir. 1963). But, "a mere mistake of judgment" on the part of the attorneys chosen by the insurance company to represent the insured does not "impose liability on" the company for the excess verdict. *See* American Casualty Co. v. Howard, 187 F.2d *supra* at 329.

In State Farm Mutual Automobile Insurance Co. v. White, *supra*, 248 Md. at 332, 236 A.2d at 273, the Court of Appeals of Maryland stated:

> In applying the "good faith" theory the courts have found that the presence of one or more of the following acts or circumstances may affect the "good faith" posture of the insurer: the severity of the plaintiff's injuries giving rise to the likelihood of a verdict greatly in excess of the policy limits; lack of proper and adequate investigation of the circumstances surrounding the accident; lack of skillful evaluation of plaintiff's disability; failure of the insurer to inform the insured of a compromise offer within or near the policy limits; pres-

sure by the insurer on the insured to make a contribution towards a compromise settlement within the policy limits, as an inducement to settlement by the insurer; and actions which demonstrate a greater concern for the insurer's monetary interests than the financial risk attendant to the insured's predicament. * * *

█ In that context, Sobus' within allegations must be scrutinized. As discussed *supra,* Sobus has shown no connection between the alleged negligent investigation and the excess adverse verdict against him. Still the absence of such proximate cause may not be conclusive as to its possible relationships with Lumbermens' good faith obligation to settle, since it is conceivable that a breach of duty regarding negligent investigation, while not actionable in and of itself because it is not a proximate cause of the adverse verdict, might be evidence of bad faith. State Farm Mutual Automobile Insurance Co. v. White, *supra* 248 Md. at 332, 236 A.2d 269 (quoted at p. 24 *supra*); Keeton, Liability Insurance and Responsibility for Settlement, 67 Harv.L.Rev. 1136, 1140–41 (1954). In the instant case, however, Knisley's attorneys offered to settle the case as late as the morning of February 24, 1969, and Lumbermens responded with an offer of all the insurance coverage afforded by the Kemper Group, which was, in fact, all of the insurance afforded by any source. *See* Facts 26, 29, 40. Furthermore, Sobus has not shown that Lumbermens failed to investigate any material fact or to familiarize itself with the evidence of any material witness. Certainly, it is possible for this Court, or for Sobus, or for anyone looking back in time, to suggest how Lumbermens might have conducted the investigation in a different and perhaps in a better way, but Sobus has alleged no acts of negligent investigation which can in any way be construed to evidence bad faith on Lumbermens' part.

Sprinkled throughout Sobus' complaint and his answer to Lumbermens'

motion for summary judgment are allegations that the insurer and the counsel the latter appointed for him failed to keep Sobus sufficiently and timely informed as to the following aspects of the case: (1) the possibility of excess liability, or of the severity of the possible excess liability (Answer to Defendant's Motion for Summary Judgment ¶ 7, Complaint ¶ 26); (2) Knisley's offers of settlement, most particularly of Gallagher's letters of January 20, 1969 and February 21, 1969 (Complaint ¶¶ 17, 19); (3) the fact that Knisley's offers of settlement were for "all applicable insurance" and not just for the Lumbermens policy, so that Sobus could have been on notice to preserve or locate all applicable policies (Answer to Defendant's Motion for Summary Judgment ¶ 13); and (4) the tenuousness of Sobus' case, which failure lulled Sobus into a false sense of security (Complaint ¶¶ 26, 28).

■ Sobus' allegations are somewhat overlapping. However, taking them one by one, as to (1), Sobus was notified as early as November 30, 1965 that Knisley had filed a suit claiming damages of $125,000 in excess of Sobus' insurance policy and was advised of his right to retain his own attorney. *See* Fact 13. As to (2), settlement was discussed between persons acting for Knisley and Lumbermens three times before February 24, 1969, that is, on September 25, 1968, on January 20, 1969, and on February 21, 1969. *See* Facts 20, 21, 24. The first such offer was communicated orally from O'Doherty to a Lumbermens agent. However, there is no evidence that news of that offer was transmitted to Sobus. Similarly, although Preston has stated in an affidavit that he showed the third letter to Sobus on February 23, 1969, Sobus has stated that he could not remember having been told of the contents of the same. *See* Fact 25. The second offer, however, which preceded the said February 23, 1969 letter, was contained in a letter from Gallagher to Preston, and a copy was sent by Gallagher to Sloan, who had represented So-

bus in certain traffic court hearings in 1965. Preston himself sent a copy of the January 20, 1969 letter to Sobus on February 19, 1969.

With regard to the status of Sloan as far as the record shows, Preston treated Sloan as Sobus' personal attorney without any indication from Sobus or, prior to August 11, 1970 (*See* Fact 37), from Sloan to Preston or to Gallagher or anyone else, that Sloan did not occupy that position. In any event, Preston certainly did not act other than in good faith and with due care in treating Sloan as Sobus' personal attorney.

Sobus further alleges that Lumbermens failed timely to apprise Sobus of Lumbermens' increasingly gloomy outlook as to Sobus' chances to prevail at trial. In a letter dated February 19, 1969, Preston informed Sobus of Preston's doubts about Knisley's ability to make out a prima facie case. Further, there is no evidence that Lumbermens or Preston kept Sobus informed that Lumbermens had for more than two years entertained serious doubts as to the credibility of Sobus' contention that Sobus was on Route 32 at the time of the accident and about Sobus' ability to prevail at trial. *See* Facts 18–19, Plaintiff's Exhibit 19. But, seemingly at no time did Lumbermens or anyone acting for Lumbermens state to Sobus that the liability issue was anything but close (*See* Fact 23). And there is also no evidence or indication that Sobus was in any way prejudiced by Lumbermens' failure to state to Sobus Lumbermens' doubts as to Sobus' story, particularly in the light of Sobus' reception of a copy of Gallagher's letter of January 20, 1969 (*see* Fact 23), which spelled out in detail Gallagher's dark appraisal of Sobus' case and which contained a demand for all applicable insurance. In sum, Sobus' allegations as to Lumbermens' negligent investigation and Lumbermens' failure to keep Sobus fully and timely informed cannot in and of themselves survive Lumbermens' summary judgment motion herein.

Detailed analysis of Sobus' attacks upon Lumbermens' conduct of the settlement negotiations is required. In that regard, Sobus' contentions essentially divide into four sub-parts: (1) Lumbermens should have affirmatively offered to settle the case; (2) Lumbermens should have plumbed the question of "applicable insurance" in response to Gallagher's letters of January 20, 1969 and February 21, 1969; (3) Lumbermens made an insufficient effort to satisfy Knisley's counsel that there was no other applicable insurance; and (4) Lumbermens acted in bad faith by refusing to accept the settlement offer propounded by counsel for Knisley. (*See* Complaint ¶¶ 22, 23, 24, 26, 28; Answer to Defendant's Motion for Summary Judgment ¶¶ 10, 11, 13).

■ Given the questionable nature of Sobus' defense, it is arguable that Lumbermens should have made an affirmative offer of settlement before the date of trial. However, it is to be noted that it was not until February 24, 1969 that Hirsch, representing the State Accident Fund, was authorized to make a settlement offer to Sobus (Defendant's Exhibit B). But even assuming that the Fund would have agreed to settle before February 24, 1969 if Knisley and Sobus had so agreed, and thus settlement before February 24, 1969 might have been possible, any failure to settle on or before February 24, 1969 caused no damage to Sobus since Preston, acting on behalf of Lumbermens on that date, offered Lumbermens' policy limits in response to Knisley's demand for all applicable insurance.

■ Sobus complains that Lumbermens acted negligently and in bad faith in failing to apprise him of the import of the term "all applicable insurance", and in failing adequately to ascertain, in response to Gallagher's letters of January 20, 1969 and February 21, 1969, whether other coverage was indeed applicable. Preston has stated under oath that prior to the examination of Sobus in Judge Macgill's chambers he had no knowledge that Sobus' father owned three vehicles and that Sobus' brother owned a fourth vehicle. (Defendant's Supplemental Reply and Affidavit at p. 3). Nor is there any assertion or indication in the record in any way to the contrary. Indeed, that contention is unchallenged. Moreover, in a statement to a Lumbermens representative, apparently C. E. Hollie (*see* Deposition of John Michael Sobus, September 16, 1972, at p. 10; Plaintiff's Exhibit 3), dated May 28, 1965, Sobus had indicated that his father owned two cars and made no reference to a truck or to any vehicle other than the two cars (Defendant's Exhibit 1). On October 4, 1965, O'Doherty wrote to Lumbermens stating that O'Doherty's investigation indicated that "your insured carries no more than $20,000 or $25,000 insurance for the injury of any one person." *See* Fact 10. Further, in his deposition of September 16, 1972, Sobus stated (at p. 29) that he first made the existence of his father's truck and his brother's automobile known to Preston on February 23, 1969.

In his letter of March 3, 1969, Gallagher himself wrote to Preston:

\* \* \* We questioned you about other insurance and you said Michael Sobus advised you that there was only one automobile in the household and that his Kemper policy was the only one available. We had prior information that this was not true and that was the very reason we requested an opportunity to depose Sobus. You will find this reflected in the first questions put to Sobus.

Everyone, including you, was surprised to learn of the number of other vehicles involved. The record will speak for itself regarding these facts. \* \* \*

(Attachment to Affidavit of Frank X. Gallagher, at p. 2).

Thus, not only has it been established that in fact no undiscovered insurance was available, but there is no question but that Preston was unaware of the possibility of additional insurance coverage before that possibility was broached by Knisley's counsel. In that context

Preston's failure more fully to investigate that possibility can hardly be assumed, even *arguendo*, to have constituted negligence on the part of an experienced attorney since Preston's apparent assumption that Sobus' insurance was carried for him by his father under the family policy not only comports with the actual facts in this case but with what is the customary type of arrangement. However, under no circumstances can such failure, if any, to investigate be deemed, without other evidence of negligence, to constitute, even in the slightest, evidence of bad faith.

As clear a picture as can be obtained of the settlement discussions on February 25, 1969 is reflected by the following interchange between counsel which took place at the bench in front of Judge Macgill and out of the presence of the jury (Defendant's Exhibit D at pp. 2–10):

Mr. O'Doherty: I think that what we want to know on behalf of our client is what is the present position of the defendant with regard to its offer. What are they offering, and what amount of money are they offering?

Mr. Preston: I thought I made that clear yesterday. I have offered all available—you demanded all available insurance, and I have offered twenty-five thousand dollars plus the fact that we also have property damage coverage, so that we would also pay for the property damage to the plaintiff's vehicle. that is all the insurance that we have, and we have offered it.

Mr. O'Doherty: When you say "we", can you identify the "we"?

Mr. Preston: Mr. O'Doherty, I represent in this case Kemper Insurance Group. This particular policy is written in Lumbermen's, one of that group. In addition to that, you asked yesterday about the brother's policy. As you know, last night you came to my office. I called the manager of the company that the brother is insured in, Mr. Claude Koppisch, Pennsylvania National Mutual. You met him at my office. He showed you a copy of the form of policy

that was issued to the brother, Jerome Sobus. He also showed you the Daily of the coverage to him. Now, you saw everything and know as much as I know about the policy of Pennsylvania National.

Mr. O'Doherty: No, I don't.

Mr. Preston: * * *

Mr. O'Doherty: * * * I am not going to represent to my client on the basis of what Mr. Preston says Mr. Scott says. I believe that our position in this case should be that it's perfectly obvious that if, if one policy of theirs applies, even this form policy that they've given to us, that there are, that there is a provision in here for supplementary payments which are in addition to the policy limits, and which cover the imperative surgical and medical treatment of my client. If that applies, and if that is the policy in effect, but what I am saying is that it is our position— may I ask you this very quickly? Will you give us the right to sue your clients under any of the policies?

Mr. Preston: Whatever rights you have you have. I'm not granting any rights. I have made an offer in good faith . . .

Mr. O'Doherty: I don't—

Mr. Preston: . . . in this case.

Mr. O'Doherty: Is your offer, though, an offer to settle this case and to, and to extinguish any rights of action which we might have against your insurers?

Mr. Preston: Mine is an offer to settle this case, period.

Mr. O'Doherty: Completely.

Mr. Preston: Completely and totally settle this case.

Mr. O'Doherty: And also against your insurers.

Mr. Preston: I've—there's no suit against any insurance company here. I don't know what—

Mr. O'Doherty: I'm talking about these policies.

Mr. Preston: I'm offering all available insurance.

Mr. O'Doherty: And the question is how do we test, how do we test what you've given us?

\* \* \* \* \* \*

\* \* \* Now, what I'm asking you straight away is, if you are offering what you contend to be all available insurance, will you allow, will you—is it with the understanding that we may test by suit *your company,* the tack-on provisions or possible tack-on provisions or any other provision of your policy?

Mr. Preston: I am not agreeing to anything except to settle this case, and I would like to say one thing about that, because what you have said is highly inaccurate about the offers to settle, and I want to get the record straight, and I want Mr. Gallagher to listen to what I am going to say.

I have never before yesterday heard from Mr. Hirsch, who is one of the counsel for the plaintiffs, about any offer to settle the case for all available insurance. After the proceeding in Your Honor's office yesterday morning, when I was told that all counsel would operate together, while in Mr. Sybert's office during the noon recess, I received a telephone call from Mr. Gallagher, who advised me on the phone that he was now authorized to speak in full for all plaintiffs in interest in the case, and that they would accept in settlement the sum, or that they would accept in settlement all available insurance on this case. I have offered to Mr. Gallagher and the plaintiffs all available insurance, which consists of twenty-five thousand dollars in the Lumbermen's policy, plus property damage, and that's where we are. I have gone far, a lot farther than I believe I've ever known a defense insurer to go in trying to get any information available to them that is available to me. I don't have the policies. The Sobuses have the policies. I asked the young man to bring the policies in today. He cannot find them and doesn't know where they are. All we have are the Dailies with Melville Scott. I have told them the amounts of the policies. I have shown them all the endorsements, which have the amounts of the policies on them, and beyond that it's Mr. O'Doherty's and the other plaintiff's counsel's decisions to make. I'm not granting any additional rights to anyone. I've done everything in good faith, and I have nothing further to say.

\* \* \* \* \* \*

Mr. O'Doherty: Would you contend that if we accepted your offer that we would not be able to sue *you* for tack-ons or pyramiding of insurance, if we— I mean the insurance declarations have not been made available, all of them have not been made available to us, and in order to make an intelligent decision, we have to reserve the right to sue you.

Mr. Preston: I'm not agreeing to your reserving any rights to sue *any insurance company.*

Mr. O'Doherty: All right. Well, under those circumstances, we cannot advise our client to accept the offer, because I'm not going to take it on myself personally—

Mr. Hirsch: Your Honor, for the record, and I speak for State Accident Fund, we did make an offer to settle this case yesterday, and I did join in with Mr. Gallagher's offer to settle this for all available insurance. It is my understanding from the counsel for Kemper that they have made an offer of all available insurance. It is further my understanding that if this representation by Mr. Preston is incorrect, then we can take whatever action we feel in regard to this misrepresentation. The only thing he is not doing, as I understand it, is he is not saying, "I am giving you permission to do it." He just doesn't have that authority. \* \* \* \* [Emphasis supplied.]

The terms of O'Doherty's proposed settlement offer are far from crystal clear. Counsel herein for Sobus have characterized those terms as reserving to Knisley the right to sue insurers other than Lumbermens if any such insurers were subsequently discovered to have provided pertinent coverage. But other meanings could easily be attached to the language used by Knisley's counsel, in-

cluding reservations to sue one or more or all of Lumbermens, Sobus, Preston and C. Ferdinand Sybert, Sr., Esq., local Howard County trial counsel associated with Preston, if any additional insurance coverage written by Lumbermens or anyone within or without the Kemper Group including Penn National, was later discovered. O'Doherty had the obligation to clarify his own rather unusual settlement offer and to specify its terms. That he did not do. Hirsch was unequivocally ready to settle and to reserve rights only if Preston's representation that Preston was offering all of the Kemper Group's available insurance turned out to be not true. Neither Lumbermens nor Preston had any obligation to guarantee Sobus' earlier statements as to insurance coverage available to him. Nor did Lumbermens have any exposure beyond $25,000. Thus, Preston had no right to expose Lumbermens to any further liability of over $25,000 which could well have been the result if Lumbermens had settled for $25,000 and it later turned out that there was additional non-Lumbermens' coverage available to Sobus. Nor was there any reason why Preston should have exposed himself to personal liability if it so later turned out. And further, had there been coverage available to Sobus from Pennsylvania National or other non-Lumbermens' sources, and if that other insurance source had subsequently paid any sums to Knisley, such source might have asserted against Sobus the latter's failure to notify it promptly of the accident and to cooperate fully and timely with such source. The record discloses specifically Preston's verbalization of his fears regarding the position in which Sobus might have been placed. (Defendant's Exhibit C, after lunch proceeding, at p. 8).[3]

Moreover, in a letter to Frank X. Gallagher, dated February 28, 1969 (Defendant's Exhibit 8), Preston made it clear that the Kemper Group would assume liability for any undisclosed insurance coverage of its own and stated specifically (at p. 3) that Knisley's counsel "would be entitled to sue" Kemper for such amount. Accordingly, even if Preston's words during the in-court settlement negotiations on February 25th and set forth in the portion of the trial transcript reproduced *supra* at pp. 31–34 were understood by Knisley's counsel to mean that Lumbermens and Kemper would not stand by Preston's representation that there was no insurance over $25,000 from the Kemper Group available to Sobus—and even if Knisley's counsel had a right so to understand

3. On February 24, 1969, the following interchange took place in Judge Macgill's chambers:

Mr. Preston: It may be other insurance is available here. Now, I'm not going, I have no right and neither does this young man to disclose on behalf of those other insurance companies the amounts of their policies. I'm not going to let him violate his insurance policy and do that, and I'm certainly not going to do it with him. Those companies would have to be communicated with first about the policies.

Mr. Hirsch: Well, I didn't mean that this man should violate any of his insurance provisions. Apparently if he has other policies and they are with other companies, and he has not notified them of this accident, he probably has already violated.

Mr. O'Doherty: No, he hasn't. If the man is not aware—

Mr. Gallagher: As I see it, he's omnibus insured at best under the other policies, and until he becomes aware of the fact that he may have other insurance, then I don't think we ought to contend that he—

Mr. Hirsch: I agree. I agree.

Mr. O'Doherty: I think under the circumstances, and I throw this out, it would be perfectly obvious to me that once having read these policies, that Mr. Preston would have to have an opportunity to contact these companies, and I would suggest that in the interest of justice, that we have the foreman step out of the box in this case, and postpone the case for perhaps two weeks or three weeks, Your Honor.

Judge Macgill, however, indicated that he did not desire to follow O'Doherty's suggestion, although subsequently before the trial got underway the following day he did, as is recited elsewhere in this opinion, give the parties in the Knisley-Sobus case the opportunity to remove that case to another jurisdiction and thereby to obtain a continuance. (Defendant's Exhibit C, after lunch proceeding, at pp. 8–9).

Preston's statements in the light of O'Doherty's unclear settlement offer—Preston's February 28, 1969 letter made his position clear well before the jury verdict was returned on March 6th.

█ Sobus further contends that Lumbermens acted in bad faith by failing to satisfy Knisley's counsel that there was no other insurance applicable. Specifically, he alleges that Knisley's counsel were not shown complete records, that Preston told Sobus to search for only his father's policy, and that Preston refused to state that Sobus was in no way covered by the Penn National policy. Those claims do not withstand scrutiny after a careful reading of the record. *See* Facts 24–33. Only two possible insurance sources were at any time mentioned, (1) the Kemper Group including Lumbermens and (2) Penn National. On Feburary 25, 1969, Preston stated unequivocally on the record that $25,000 was all the insurance available from Kemper-Lumbermens sources and that he was offering all of it. (Defendant's Exhibit 5–A at pp. 2–3). On February 28th, as indicated *supra,* Preston specifically stated that Kemper would continue responsible for that representation after the $25,000 settlement if the representation turned out not to be true. As to the Penn National coverage, on the night of February 24, 1969, Preston arranged for a Penn National representative to be available for questioning by Knisley's counsel. Further, Preston has stated in an affidavit that he turned over to Knisley's counsel all of the information that he obtained from Melville Scott and Son relating to the Penn National coverage. (*See* Affidavit of Wilbur D. Preston, Jr., November 23, 1973, at pp. 5–8). That statement by Preston has not been challenged, though there is some factual dispute over what was shown Knisley's counsel, *see* Fact 28. While that dispute is seemingly not material, this Court assumes in the summary judgment posture of this case that Knisley's counsel was shown only what they say they were shown. As to what Preston on February 24th instructed Sobus to obtain and bring with Sobus to court on February 25th, despite Sobus' later unclear memory (Defendant's Exhibit 4 at pp. 34–35; *see* Fact 27), the transcript of February 24, 1969 discloses that Sobus told counsel for Knisley that "up-to-date copies" of both his brother's and his father's policies were at home and that Sobus could return home and obtain them for examination by Knisley's counsel. (Defendant's Exhibit C, after lunch proceeding, at pp. 5–7).[4]

█ Sobus' final contention, that Lumbermens failed properly to pursue settlement negotiations after the adverse verdict had been rendered, is unsupportable. In the aforementioned February 28th letter, Preston not only expressed a willingness to settle the case for all insurance available under any Kemper policies, but offered Gallagher "every opportunity to check the available records relating to coverage" provided by any other insurer. (Defendant's Exhibit 8 at p. 4).

In sum, even from a grandstander's second view of the actions and lack of actions of Lumbermens and its attorneys, the uncontroverted facts and governing legal principles applicable to those facts disclose no basis upon which this Court could permit a jury to bring in a verdict against the defendant herein in favor of the plaintiff herein. Accordingly, defendant's motion for summary judgment is hereby granted.

---

4. In an effort to determine if there were any additional factors to be considered by this Court with regard to Sobus' allegations of Preston's failure to accept O'Doherty's settlement offer, this Court suggested to counsel on both sides of this case that they obtain objective, non-partisan opinions from one or more members of the bar with rela-
tion thereto. Counsel thereafter submitted sworn opinions of other attorneys. While the analyses set forth in those opinions are helpful to this Court, they are in no way relied upon by this Court as fact or other than as legal argument, in the context of this Court's consideration and grant of defendant's summary judgment motion.